UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RACHEL POST,

                Plaintiff,                                Case No. 18-cv-13773

vs.                                                          Honorable: Mark A. Goldsmith

TRINITY HEALTH-MICHIGAN D/B/A
ST. JOSEPH MERCY OAKLAND,

                Defendant.
_____/

**OPINION & ORDER
(1) GRANTING IN PART AND DENYING IN PART ST. JOSEPH MERCY
OAKLAND'S MOTION FOR SUMMARY JUDGMENT (Dkt. 67) AND (2) DISMISSING
THE STATE LAW CLAIMS WITHOUT PREJUDICE**

Defendant Trinity Health-Michigan d/b/a St. Joseph Mercy Oakland (SJMO) has moved for summary judgment (Dkt. 67). It is entitled to summary judgment with respect to the remaining federal claims.[1] The remainder of the case involves state law claims over which the Court has supplemental jurisdiction. See 2d Am. Compl. (Dkt. 57). A district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). The Court exercises that option here. The remaining state law claims are dismissed without prejudice, and the portion of the motion for summary judgment addressing those claims is denied without prejudice.

### I. BACKGROUND

Plaintiff Rachel Post began working for SJMO in 1980 as a registered nurse. Post Resume at 1 (Dkt. 76-4). Following additional training and certification, she worked for SJMO as a nurse anesthetist from 2004 until 2013. Id. In 2013, she became an employee of Wayne State United

---

[1] Counts IV and V were dismissed with prejudice by stipulation (Dkt. 75). The portion of the motion for summary judgment addressing those claims is denied as moot.

Physician Group (UPG). Id.; Post Dep. at 13, 33 (Dkt. 67-20). After Post became a UPG employee, she continued working as an allied health practitioner at SJMO—that is, a non-employee who provides patient care. Post Dep. at 33–35. UPG is not a party to this claim due to its bankruptcy. See Resp. Br. at 1 (Dkt. 76-1).

On October 28, 2016 Post struck her head against a monitor in an endoscopy room where she was working. Post Dep. at 42–47. She was treated in the hospital's emergency room. Id. at 53–56. According to Post, numerous individuals had previously hit their heads on the monitor, though she was unaware of anyone previously being seriously injured by it. Id. at 30. Shortly after her injury, Post took a leave of absence. Id. at 56.

Beginning in 2017, she attempted to return to work. She had the assistance of nurse case manager Paula Nault, who was engaged by The Hartford Insurance Company. See Nault Decl. ¶ 5 (Dkt. 76-11). According to Nault, Post was released by her physician to return to work on a gradual basis beginning March 6, 2017. Id. ¶ 17. However, according to Post, her efforts were stymied by UPG, SJMO, and their various employees and agents. An overview of their alleged efforts to keep her from returning to work follows.

Once Post was cleared by her physician to begin her return to work, Nault attempted to contact several individuals at UPG and SJMO. Id. ¶ 19. She eventually connected with Janet Mulcrone, UPG's human resources manager. Id. In a March 31, 2017 email to Lee Ann Lucas, a claim consultant with The Hartford, Mulcrone expressed concerns about Post's ability to administer anesthesia safely. 3/31/17 Emails at PageId.1814 (Dkt. 76-11). Mulcrone stated that using an anesthesia simulation lab might be a way to assess Post's ability. Id. Lucas responded the same day and explained that Post had been released to proceed with the simulation lab. Id. Lucas copied Nault on the email and encouraged Nault and Mulcrone to coordinate. Id.

2

According to Nault, Mulcrone ignored her attempts to contact her after April 3, 2017. Nault Decl. ¶ 29. Because of UPG's lack of cooperation, Lucas retained a vocational case manager, Dessie Johnson, to schedule simulation sessions directly with SJMO, which owned the simulation lab. Id.

Johnson made arrangements with the director of the SJMO simulation lab, Nirupa Gopinath, to use the simulation lab. Johnson Decl. ¶ 23–26 (Dkt. 76-10). Gopinath told Johnson that SJMO would not be involved in assessing Post's ability or readiness to return to work. Id. ¶ 24. However, Post's treating physician agreed to assess Post's readiness to return to work, and several of Post's certified registered nurse anesthetist colleagues were available to assist. Id. ¶ 25–26.

In the middle of July 2017, Gopinath informed Johnson that SJMO had changed its mind about allowing Post to use the anesthesia simulation of equipment. Id. ¶ 27, 29, 31–33. According to Johnson, this decision was made by Terrence Ellis, who said that the lab was not certified and did not have the equipment to evaluate Post. Id. ¶ 32 Ellis was the interim chair of UPG's anesthesiology department at SJMO. Ellis Dep. at 26 (Dkt. 76-13).

Nault learned from Johnson in July 2017 that SJMO changed its mind. Nault Decl. ¶ 29. Nault continued pursuing the matter with Mulcrone, who reportedly told Nault that there was no job for Post to return to, and that Post would be laid off if she returned. Id. ¶ 33.

During the same time period, Nault also communicated with human resources at SJMO, because Post told Nault that SJMO officials had stopped the processing of Post's application to renew her privileges at SJMO. Id. ¶ 35. Kristen Snooks, who worked for SJMO, told Nault that SJMO's hands were tied until UPG released Post to return to work. Id. ¶ 37.

Michael Smith of SJMO sent Post a letter dated August 30, 2017 stating that SJMO would not process her application for reappointment while she was still on a leave of absence from UPG. Smith Letter (Dkt. 67-13). The letter also stated that Post's privileges would expire on September 16, 2017. Id. However, before the privileges expired, SJMO granted Post's request for a leave of absence through January 10, 2018. Fregoli 9/14/17 Letter (Dkt. 67-16).

Post was cleared to work without restrictions by her physician on October 6, 2017. Dabrowski 10/6/17 Letter (Dkt. 67-17). On October 13, 2017, UPG informed Post that she would be terminated due to a reduction in force. Termination Letter (Dkt. 67-18). Her last day of employment would be December 6, 2017 pursuant to a 60-day notice period. Id. However, because she was not credentialed to perform her work as a nurse anesthetist, she was released without pay during the 60-day notice period. Id.

The parties dispute whether workforce reduction was the genuine reason behind the termination and whether SJMO personnel were involved in UPG's decision to terminate Post.

## II. ANALYSIS[2]

The second amended complaint presents the following counts against SJMO:

I. Wrongful interference in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12203(b);

II. Conspiracy to discriminate against Plaintiff in violation of the ADA, 42 U.S.C.§ 1985(3), 12112(a);

---

[2] The Court utilizes the standard principles for deciding this summary judgment motion. A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment should be awarded. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

    III.    Violation of the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1602;

    IV.    Conspiracy to discriminate against Plaintiff in violation of the Age Discrimination in Employment Act (ADEA), 42 U.S.C.§ 1985(3), 29 U.S.C. § 621, et seq.;

    V.    Violation of the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.1202, 37.2202, 37.2701; and

    VI.    Negligence, with respect to the underlying injury.

See 2d. Am. Compl. ¶¶ 139–197.

As stated above, Counts IV and V were dismissed by stipulation following the filing of the motion for summary judgment (Dkt. 75). As discussed below, SJMO is granted summary judgment with respect to Counts I and II. Count II, as Post concedes, is not viable under Sixth Circuit precedent. With respect to Count I, Post fails to plead or provide evidence of an essential element of her interference claim: discriminatory animus or an intent to interfere. Therefore, SJMO is entitled to summary judgment. Finally, the state law claims are dismissed without prejudice.

    **A. Count II**

The conspiracy claim is barred by the Sixth Circuit's position that § 1985(3) "does not cover claims based on disability-based discrimination or animus." Bartell v. Lohiser, 215 F.3d 550, 559 (6th Cir. 2000). Post concedes Bartell's holding but identifies Second, Third, and Eighth Circuit caselaw taking the opposite approach. See Resp. Br. at 23–25. She makes no attempt to distinguish Bartell; she simply asserts that the other circuits have the better approach. However, this Court is not free to jettison clear authority from the Sixth Circuit. SJMO is granted summary judgment with respect to Count II.

### B. Count I

After acknowledging <u>Bartell</u> and its impact on Count II, Post makes a terse argument with respect to Count I. Here is that argument, in its entirety:

> However, a similar claim, as set forth in Count I of Post's pleading, is specifically permitted under the ADA itself. 42 U.S.C. §12203(b) provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with" any individual's rights under the Act. (emphasis added). In this case, the record evidence makes clear that SJMO, through its employees and agents, interfered with Post's rights under the [ADA]—at least genuine issues of material fact exist that preclude summary judgment.

<u>Id.</u> at 24.

Due to the insufficiency of that argument, the Court directed the parties to submit supplemental briefing. <u>See</u> 6/24/21 Order (Dkt. 81). Specifically, Post was ordered to "file a supplemental brief explaining (i) what the elements are regarding the claim she asserts in Count I, and (ii) how she has raised at least an issue of fact as to each of the elements." <u>Id.</u> at 2. She filed a supplemental brief accordingly (Dkt. 82), to which SJMO responded (Dkt. 83).

In the supplemental brief, Post abandoned the position she appeared to take in her second amended complaint, that SJMO's alleged acts of "aiding and abetting" UPG in UPG's ADA violations would constitute ADA interference on SJMO's part. <u>See</u> 2d. Am. Compl. ¶ 147 (Dkt. 57).

Post advocates for a four-element test in which she could make out a prima facie case of interference by proving that "(1) she engaged in protected activity under the ADA; (2) SJMO knew of that activity; (3) SJMO took action that interfered with the protected activity; and (4) there was a causal connection between the protected activity and the interference." Pl. Suppl. Br. at 4. Notably absent in this test is any culpability standard. Post's claim fails because her proposed test does not contain a crucial element: that SJMO either intended to interfere with her right to

6

reasonable accommodations from UPG, or that SJMO acted with discriminatory animus. Because she has not presented facts that could support a finding that she can meet this element.

Understanding the importance of such an element in the context of this case requires an understanding of interference claims generally, and interference claims against third parties (e.g., non-employers) in particular. The Court now turns to that discussion.

### 1. ADA interference claims

As Post argues, the ADA prohibits interference with the exercise of rights protected under that statute:

> **(b) Interference, coercion, or intimidation**
>
> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b).

Neither party has identified Sixth Circuit caselaw interpreting the anti-interference provision of § 12203(b). Other courts have recognized a cause of action under the anti-interference provision. For example, the Seventh Circuit applies a four-part test akin to the test applied in the context of the Fair Housing Act's anti-interference provision. See Frakes v. Peoria School District No. 150, 872 F.3d 545, 550–551 (7th Cir. 2017). Under that test, a plaintiff must prove "(1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants were motivated by an intent to discriminate." Id.

Some courts have treated § 12203(b) as essentially a second anti-retaliation provision, though perhaps a broader one. See, e.g., Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 570 (3d

7

Cir. 2002) ("We have noted that the scope of this second anti-retaliation provision of the ADA 'arguably sweeps more broadly' than the first."); Rose v. Wayne Cty. Airport Auth., 210 F. Supp. 3d 870, 885 (E.D. Mich. 2016) ("As the First Circuit explained in Champagne v. Servistar Corp., 138 F.3d 7, 13–14 (1st Cir. 1998), in order to prevail on a section 12203(b) claim, the plaintiff must allege the elements of retaliation, including protected conduct, adverse action, and an unlawful response provoked by the protected conduct and directed individually at the plaintiff."). The D.C. Circuit recently rejected this approach on anti-surplusage grounds, although it did not announce a clear alternative test. See Menoken v. Dhillon, 975 F.3d 1, 9 (D.C. Cir. 2020).

One matter that appears to be agreed upon is that "anti-interference provisions such as those contained in the [Fair Housing Act] and ADA cannot be so broad as to prohibit 'any action whatsoever that in any way hinders a member of a protected class.'" Brown v. City of Tucson, 336 F.3d 1192 (9th Cir. 2003) (quoting Mich. Prot. & Advocacy Serv. v. Babin, 18 F.3d 337, 347 (6th Cir.1994)); see also Menoken, 975 F.3d at 10 (noting that both parties to that case agreed to Brown's limiting principle).

### 2. Third party interference claims

One aspect of this case that is unusual is that Post has alleged an employment-related interference claim against an entity that was not her employer. So one question that arises is whether she can pursue an interference claim against SJMO at all. Based on Sixth Circuit caselaw, the Court concludes that such a claim is not entirely foreclosed.

The ADA has four subchapters, covering employment, public services, public accommodations and services operated by private entities, and "miscellaneous." See generally 42 U.S.C. §§ 12101–12203. Retaliation and interference both fall within the miscellaneous section. Id. § 12203(a)–(b).

SJMO was not Post's employer, and Post did not allege that it owed her any duties as a provider of public accommodations. So Post was limited to § 12203. The ADA's anti-retaliation remedy, 42 U.S.C. § 12203(a), is unavailable in employment-related disputes against non-employer defendants. See Hiler v. Brown, 177 F.3d 542, 546 (6th Cir. 1999); Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 808 n.1 (6th Cir. 1999).

The anti-interference provision is not necessarily so constrained. In dicta, the Sixth Circuit stated that it could "envision, at least hypothetically, that there could be interference with the rights of a disabled individual by a third party." Binno v. Am. Bar Ass'n, 826 F.3d 338, 348 (6th Cir. 2016).[3] So the Court does not dismiss, out of hand, the possibility that an ADA interference claim could be brought against SJMO.

### 3. The need for an intentionality or discriminatory animus requirement in third party interference claims

With this background in mind, Post's proposed test may now be considered. The problem with Post's test is that the absence of a culpability standard, or some other limiting principle, would run afoul of Brown's statement that the anti-interference provision cannot be read so broadly as to prohibit any act whatsoever that in any way hinders a member of a protected class. More specifically, it would potentially impose liability on an untenable number of third-party actors.

One relevant example illustrates the problem. At some point in the process, Ellis recommended that the University of Michigan might be a suitable place for Post to use a simulation lab. See Post Dep. at 138. So consider, hypothetically, if Post had sent the following email to someone in charge of the University of Michigan simulation lab:

---

[3] Although Binno involved an alleged violation of the subchapter concerning public accommodations and services operated by private entities and alleged interference with rights guaranteed by that chapter, Binno's logic seems applicable to interference with enjoyment of the rights guaranteed by the employment chapter.

9

> I have a disability and am in the process of rehabilitation. I am seeking a reasonable accommodation from my employer, UPG, namely, that it consider my rehabilitation progress based on my ability to perform in an anesthesiology simulation lab under the supervision of staff my insurance company can provide as well as my doctor. Please let me know when it would be a convenient time for me to use the lab.

No one could reasonably doubt that the University of Michigan—a complete stranger to Post, UPG, SJMO, and The Hartford—would be well within its rights to deny this request. But the trouble is, Post would be able make out a claim on all four of her elements against the University of Michigan. Under this scenario, she would have engaged in protected activity by requesting a reasonable accommodation from UPG, she would have notified the University of Michigan of this protected activity; its refusal to open the simulation lab to Post would have interfered with her ability to receive the accommodation from UPG; and Post's attempt to receive her accommodation would have caused the interference.

Post's difficulty is that SJMO was not particularly different from the hypothetical University of Michigan. It was not her employer, it did not seem to have any general policy of allowing rehabilitating workers to use its simulation lab, and it was not the provider of any public accommodations. It was an unaffiliated third party caught between Post and her allies from the Hartford on one side, and Ellis and UPG on the other.

It is noteworthy that the cases Post cites for her proposed interference test all involved defendants who had ADA obligations to the plaintiff other than through § 12203. See Brown, 336 F.3d at 1182 (involving a plaintiff who sued her employer); Champagne, 138 F.3d at 8 (also involving a plaintiff suing his employer); Rose, 210 F. Supp. 3d at 855 (involving plaintiffs who sued an airport providing public accommodations). For defendants in those circumstances, adding an element for intentionality or discriminatory animus would be unnecessary, because it would be easy to infer wrongfulness from facts satisfying Post's proposed elements. The interference clause

10

operates in those cases to protect a plaintiff's right to vindicate rights guaranteed by the sections of the ADA other than § 12203. But here, where the alleged interference is untethered from any other obligation SJMO had to Post, something more than Post's elements must be shown.[4]

What precisely is that "something more"? Defendants propose one possibility: discriminatory animus. To support this claim, they cite Youngblood v. Prudential Ins. Co., 706 F. Supp. 2d 831, 835–841 (M.D. Tenn. 2010), a case that also involved an interference claim against a defendant who lacked obligations to the plaintiff outside of § 12203. Drawing on the connection between interference under the ADA and the Fair Housing Act, as well as the Sixth Circuit's requirement of discriminatory animus to state an FHA claim, Youngblood held that discriminatory animus was an absolute requirement to state an ADA interference claim. Id. (analyzing Babin and Campbell v. Robb, 162 F. App'x 460, 473–474 (6th Cir. 2006), two fair housing act cases). Based on Campbell, Youngblood even found that retaliatory animus was insufficient to state an ADA interference claim. Youngblood, 706 F. Supp. 2d at 840.

Despite Youngblood's persuasive interpretation of Babin and Campbell, it seems possible that ADA interference could be proved by a showing that the defendant acted with an intent to interfere. That is, if a third-party defendant—for example, a non-employer in an employment context—took some action that did not merely cause interference with the employee's ability to exercise her ADA rights with respect to the employer, but was intended to cause such interference, such intentional interference might be actionable.

---

[4] One further reason confirms this Court's position that the retaliation elements are not enough to state an interference claim. As noted above, Hiler prevents plaintiffs from bringing retaliation claims against third party defendants. 177 F.3d at 546. This restriction would be essentially meaningless if plaintiffs could merely rebrand retaliation claims as interference claims.

### 4. Application

If <u>Youngblood</u> is correct, Post's claim must fail. She neither alleges nor offers any evidence to prove that SJMO acted with discriminatory animus. Post argues that SJMO "capitulated" to Ellis's demands that Post not use the simulation lab, and that it "agreed to stop [the] re-appointment and credentialing process for Post because Dr. Ellis believed/had the perception that Post had an ongoing cognitive impairment resulting from her concussion." Pl. Suppl. Br. at 8–9. At most, Post has shown that SJMO acted with indifference and acquiescence as her employer discriminated against her. But under <u>Youngblood</u> and the FHA cases it draws upon, this is not enough.

If an interference claim can be made from an intent to interfere, the facts do not support such a claim. They amount to no more than the conclusion that SJMO acquiesced to, or perhaps failed to interfere, with UPG's alleged discrimination. This does not amount to ADA interference.

Therefore, SJMO is entitled to summary judgment on the ADA interference claim.

### C. Counts III and VI

Post's remaining claims involve the Michigan Persons with Disabilities Civil Rights Act and state law negligence. Because the dismissal of the federal claims means that this case no longer retains a federal character, the Court dismisses these state law claims without prejudice and denies the motions challenging the state law claims without prejudice. <u>See</u> 28 U.S.C. § 1367(c)(3); <u>Gohl v. Livonia Pub. Sch.</u>, 134 F. Supp. 3d 1066, 1069 (E.D. Mich. 2015), <u>aff'd</u>, 836 F.3d 672 (6th Cir. 2016).

### III. CONCLUSION

For the reasons stated above, SJMO's motion for summary judgment (Dkt. 67) is granted in part and denied in part. SJMO is awarded summary judgment with respect to Counts I and II.

The portion of the motion addressing Counts IV and V is denied as moot. Counts III and VI are dismissed without prejudice, and the portion of the motion for summary judgment addressing those claims is denied without prejudice.

    SO ORDERED.

Dated: July 30, 2021                              s/Mark A. Goldsmith
      Detroit, Michigan                      MARK A. GOLDSMITH
                                               United States District Judge